KLEINFELD, Senior Circuit Judge,
dissenting:
I respectfully dissent.
A Supreme Court concurrence commented that the courts have had “difficulty in applying” the rule for deciding which *1115 government actions fall within the discretionary function exception.[1] Indeed. In this case, we have allowed the discretionary function exception to swallow the statutory rule that the federal government waives its sovereign immunity for torts for which an ordinary person would be liable. Under the Court’s opinions in United States v. Gaubert[2] and Berkovitz v. United States,[3] the negligence in this case falls outside the discretionary function exception. The majority mistakenly expands the exception and contracts the rule, and thereby creates tension with our recent decision in Young v. United States[4] as well as Whisnant v. United States[5] and Bear Medicine v. United States,[6]
The Federal Tort Claims Act says that the government “shall be liable ... [for torts] in the same manner and to the same extent as a private individual under like circumstances.”[7] This broad waiver is subject to an exception for claims “based upon the exercise or performance or the failure to exercise or perform a discretionary functioni or duty ... whether or not the discretion involved be abused.”[8] The language appears clear, but the application is not.
The fundamental problem the courts have had applying the exception is that all but strict liability torts involve the exercise of discretion. How much slower than the speed limit should I drive in rain and fog? [9] Should I trim this tree because a limb overhangs the sidewalk and could eonceiv ably fall on a pedestrian in a windstorm? [10] Or shall I leave it alone because of the aesthetic pleasure it gives to me and passersby? Must I have my dog put down because it may bite the child next door if he trespasses, or cap I continue to enjoy-my dog? [11] Shall I (a physician) get an expensive CT scan for this patient to rule out a highly unlikely diagnosis?[12] Shall we quit manufacturing our cheap ladders and triple the price to make ladders that do not collapse or tip even when people use them improperly? [13] Replace all the seats in our 747’s with new, more fire-resistant seats? Shall we recall all our chain saws, or all our cars, because of very slight risks?
If those were the kinds of discretionary decisions the statutory exception meant to cover, then the statutory “private individual” rule would be nearly nullified, applying only to negligence per se, where a statute or regulation left no discretion in the matter. The Supreme Court has grappled with this verbal difficulty and narrowed the discretionary function exception to the kind of policy discretion that only the government exercises. Even this limitation is *1116 hard to apply, because the homeowner deciding whether to cut the tree limbs herself balances the public interest in a pretty walk down the street against the public interest in avoidance of the risk from a falling branch. So policy choices, for the exception to be cabined at all, have to be limited to peculiarly governmental ones. This is difficult too, because the private interests that private individuals have often coincide with public interests, as in lower prices or greater aesthetic appeal, and government undertakes many tasks generally or previously performed privately-
The holding of the majority opinion appears to be that if no law or regulation mandates or prohibits the government’s action or inaction, and even one “policy” reason can be adduced before or after to justify the government’s action or inaction, then the exception applies. This limits the waiver of sovereign immunity to negligence per se and conduct that in no way can be rationalized after the fact. The majority fails to draw the distinction that the Supreme Court has struggled to formulate, between a “policy” reason and a mere after-the-fact rationalization or personal preference of 'a government employee or official.
There never was a park policy to leave dangerous animals alone because “the public desired to see the goats,” the policy reason upon which the majority relies. This was a park, not a zoo with caged animals, and the express formal park policy was to protect the public from dangerous animals. Only after the goat killed Mr. Boardman did the Park come up with the rationalization for their inaction that “the public desired to see the goats.” The park staffs shot and killed the goat immediately after it killed Mr. Boardman. The discretionary function exception should be construed as limited to decisions where a government policy decision guided the exercise of discretion, and not expanded to situations where it did not, even when a policy judgment can subsequently be imagined and articulated. We rejected such an after-the-fact rationalization in Bear Medicine v. United States: “our inquiry into the nature of a decision is not meant to open the door to ex post rationalizations by the Government in an attempt to invoke the discretionary function shield.”[14]
Letting an identified aggressive 370-pound goat threaten park visitors and rangers for years until it killed one amounted to a failure to implement the formally established park policy for managing dangerous animals. Written park policy provided a series of steps for dealing with animals dangerous to park visitors, from frightening the animal away to removing or killing it. The Park had used the earlier steps, including repeatedly shooting the goat with nonlethal loads such as beanbags, but they did not work. Yet the superintendent left the animal free to terrorize tourists for another summer season instead of following the next step of the written policy, removing or killing it. This was “ordinary garden-variety negligence,” [15] like keeping a dog that has already bitten a child, and subsequently bites another. Official park policy for Olympic National Park put protection of human life ahead of protection of animal life, and did not protect nonindigenous animals such as this goat. Failure to implement this policy was not another policy, just ordinary negligence.
FACTS
Like a lot of national park visitors, the Boardmans and their friend were aging *1117 tourists. Mr. Boardman, 63, was killed by a horned animal bigger than an NFL lineman, that had been the terror of the Park for four years. The 370-pound goat spotted them as they enjoyed a picnic, and approached, pawing the ground, and menacing them. It was too close to throw rocks at it, so Mr. Boardman tried to hold it off with his walking stick as they retreated. They walked away from it for about a mile, with Mr. Boardman in the rear protecting the ladies with his stick, but the goat would not go away. Then the goat attacked Mr. Boardman, gored him, and stood over him, keeping assistance away, as he bled to death. Too late for Mr. Boardman, park rangers finally carried out park policy for dangerous animals. A couple of hours after it had killed Mr. Boardman, park rangers easily found the goat about a half mile away, his horns stained with Mr. Boardman’s blood, and shot it dead.
This was no random, unpredictable, animal attack. Park personnel knew this particular goat and had been dealing with its unusual, aggressive behavior toward them and toward park visitors for four years. The park personnel had even named it, “Klahhane Billy,” whom they well knew to be the terror of the heavily used Switchback Trail on Klahhane Ridge. A written report in 2006, four years before the goat killed Mr. Boardman, said that a goat aggressively followed hikers and retreated only after being beaten with a walking stick. The Park received four more reports of an aggressive goat the next year, 2007. These were not just reports from visitors of perhaps timorous temperaments. One was from a park ranger, who said that the goat blocked the trail, chased her for two miles, and tried to charge her.
Recognizing the danger, rangers began monitoring the goats and placed warning signs at trail heads. Three years before the goat killed Mr. Boardman, 2007, eleven goats were captured and collared with GPS units. That is when Klahhane Billy was identified as the “only ... collared animal in this area that was recorded to have aggressive behavior.” Two years before it killed Mr. Boardman, in 2008, when the park officials knew which goat was the problem, a hiker reported that the goat chased him at a “jogging pace.” Since the park officials knew that Klahhane Billy threatened people and did not fear them, park personnel began using what they called “aversive conditioning techniques.” That meant yelling and throwing rocks at Klahhane Billy to teach it to fear and avoid people. The “aversive conditioning” did not work. Hikers continued to report aggressive goat incidents as the 2008 season drew to a close.
By the next summer, 2009, park personnel knew that Klahhane Billy was dangerous and that the “aversive conditioning techniques” had failed. The Park Superintendent, Karen Gustin, had been so advised. The Park’s Wildlife Branch Chief and biologist, Dr. Patti Happe, sent her an email in June of 2009, a year before it killed Mr. Boardman, warning that Klah-hane Billy was getting worse. She was getting reports of risk of injury even from her predecessor, and “it may be only an [sic] matter of time until someone is hurt”:
As you know, this goat has been a problem for several years now ... and is behaving in an increasingly] aggressive manner. This year I am getting reports of people feeling that the[y] are at risk of injury (including my predecessor in this job who has a lot of experience working with goats).
He is definitely negatively impacting the Park visitors ability to experience and enjoy the area trails, and it may be only an [sic] matter of time until someone is hurt. (Emphasis added).
*1118 Two days after the email, Gustin directed more aversive conditioning, and rangers began patrolling with paintball and beanbag guns to shoot the goat.
During the 2009 season, the escalated aversive conditioning continued to fail. The next month, July 2009, Billy charged a family twice. Fortunately, the father was able to protect his wife and children by throwing rocks at it. Park rangers then shot the goat with paintballs and bean bags, but even having been shot with these weapons (which tourists visiting national parks would not have), Billy returned to the trail within fifteen minutes. Nor did the impacts from these weapons persuade the goat to avoid people. In October 2009, Billy chased another park visitor down the trail.
The next season, the summer of 2010, reports got worse. Klahhane Billy butted a hiker with its head but fortunately did not gore him. On July 5, 2010, another park ranger, Sanny Lustig, sent an email to park employees referencing multiple aggressive attacks by this identified animal. She wrote “his MO is to follow people to the trailhead, rear up and come in close proximity brandishing his hooves, and the latest was an actual report of a head butt. He’s big, he’s not wary, he pesters, he looks mean and as if he’ll get aggressive.”
In response to this escalating aggression, Dr. Patti Happe, the chief biologist, wrote “[i]f he has indeed made contact with someone via head-butting, it may be time to talk about taking the next step before someone gets hurt.” The next steps under written policy, the Park’s Nuisance and Hazardous Animal Management Plan, would have been capture and release, capture and translocation, and destruction of the animal. Two days later, another biologist reported that the goat chased her. She said “I am skeptical that a bit of adverse conditioning will do much for him. He sees hundreds of harmless people every day.... I was shocked by how determined he was. I caught him 4 times with rocks to no effect. He could be really scary to many people.”
In late July 2010, two and a half months before the goat killed Mr. Boardman, the Park, recognizing the failure of its “aversive conditioning techniques,” finally decided to consider other management options including relocating the goat. Dr. Happe wrote an email to a biologist with Washington Department of Fish and Wildlife on July 30, 2010:
As I mentioned on the phone, we have a mature billy on the [sic] at the hurricane ridge area of Olympic National Park that has become very habituated and not responding to our efforts to have him keep at a greater distance from people. Recently, he has been becoming increasingly aggressive and park management would like to explore other management options for him, including relocation from the area.
According to Dr. Happe’s subsequent email to Superintendent Gustin and other park employees, the state’s biologist “was very willing to help, is thinking about alternatives ranging from relocation ... or to captivity, and will help with the capture.” Gustin replied, “[t]his sounds like good news.” But despite having explored the relocation option successfully, the Park Superintendent did not do it.
The record does not show that the Park did anything about the goat at all in the next two and a half months. Nor does the record show any decision or decision-making process by the Park Superintendent, Karen Gustin, about whether to accept the state’s offer to have the goat relocated to state land or have the goat killed. In October, at the end of the summer season, nothing having been done to protect park visitors, Klahhane Billy killed Mr. Board-man.
*1119 ANALYSIS
The Federal Tort Claims Act makes the United States liable for tort claims to the same extent “as a private individual under like circumstances.” [16] The Act intended to compensate those harmed by government negligence. We have held that “it should be construed liberally, and its exceptions should be read narrowly.”[17] The exceptions are voluminous, for intentional torts such as assault, battery, malicious prosecution, libel, slander, deceit, and the like, as well as for various government functions such as tax collection and delivery of the mail,[18] and damages are limited to compensatory damages without interest.[19] The torts for which sovereign immunity is waived are mainly traditional common-law negligence.
The exception at issue in this case, the “discretionary function” exception, excludes from this broad waiver of immunity “[a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.”[20] This limited exception protects only “political, social, and economic judgments that are the unique province of the Government.” [21] It therefore does not shield government negligence from liability merely on the grounds that the action or inaction involved, as almost all' negligence does, some element of discretion.
In determining whether this exception applies, “the question of whether the government was negligent is irrelevant.”[22] The question of how the government was negligent remains “critical.”[23] “[DJeter-mining the precise action the government took or failed to take (that is, how it is alleged to have been negligent) is a necessary predicate” to determining the applicability of the discretionary function exception.[24] The majority mistakenly characterizes Chadd’s allegation of wrongdoing as challenging only the Park’s failure to kill the goat, omitting the available removal option. Chadd challenges “[flailing to remove or destroy” the goat, analogizing Superintendent Gustin’s non-decision and inaction to that of a landowner who knows of and fails to exercise reasonable care to protect invitees from an unreasonable risk of harm that the landowner cannot reasonably expect them to discover and protect themselves against. The argument is that she knew aversive conditioning (yelling and throwing rocks at the goat and even shooting it with nonlethal weapons) had failed and the goat was getting more aggressive, yet did nothing more to protect park visitors from it.
Chadd concedes that there was no mandatory directive prescribing a specific course of conduct at a certain time. This is not a negligence-per-se case. In negligence per se, “[a]n actor is negligent if, without excuse, the actor violates a statute that is designed to protect against the type *1120 of accident the actor’s conduct causes, and if the accident victim is within the class of persons the statute is designed to protect.” [25] The kind of negligence alleged in Berkovitz v. United States, where a federal agency issued a license to a polio vaccines manufacturer without first receiving the product safety information required by the regulation, was of that sort; the violation of law amounted to negligence.[26] Compliance with statutes and rules, though, does not preclude a finding that the actor is negligent. “An actor’s compliance with a pertinent statute, while evidence of non-negligence, does not preclude a finding that the actor is negligent ... for failing to adopt precautions in addition to those mandated by the statute.”[27] If the speed limit is 55, but in the darkness, ice and snow prevailing at the time, a reasonable and prudent driver would go no faster than 35 or 40, then a speed of 50, though well within the speed limit, may be negligent. Likewise, the federal government is not shielded from liability because Superintendent Gustin did not violate a specific statutory or regulatory command. Plaintiffs case is indeed, as appellants argue, a garden-variety negligence of a land possessor case, controlled by the tort law of Washington.[28] The exceptions to the Federal Tort Claims Act do not purport to limit the government waiver of sovereign immunity to negligence-per-se cases.
The simplistic view that if no regulation prohibited or required different conduct, then the government actor had discretion, and if the government actor had discretion, then the discretionary function exception shields the government, is bad law, rejected by the Supreme Court. The Park’s management of the goat “involve[d] an element of judgement or choice.”[29] That is indeed the first step of analysis for the discretionary function exception under Berkovitz v. United States. But just as the 55 speed limit does not immunize someone driving at 50 on ice, an element of discretion allowed to the government actor is only necessary and not sufficient to invoke the discretionary function exception.
The controlling question is whether the particular exercise of discretion was “of the kind that the discretionary function exception was designed to shield.”[30] Many attempts, none entirely successful, have been made to provide a general statement of what sorts of exercises of discretion are of this kind. They are best sorted out and applied in light of the purposes of the waiver of sovereign immunity and the exception. The waiver is intended to make the government responsible for garden-variety torts such as mail truck collisions occasioned by their drivers’ negligence. As the Supreme Court held in Indian Towing Co. v. United States, “[t]he broad and just purpose which the statute was designed to effect was to compensate the victims of negligence in the conduct of governmental activities in circumstances like unto those in which a private person would be liable and not to leave just treatment to the caprice and legislative burden of individual private laws.”[31] The excep *1121 tion is intended to enable government to make and act upon policy determinations without court interference with the social judgments made by the political branches. As the Court held in United States v. Varig Airlines, “Congress wished to prevent judicial ‘second-guessing’ of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.”[32]
To understand what constitutes the exercises of discretion “of the kind that the discretionary function exception was de-' signed to shield,”[33] it is necessary to look at the cases that the exception applied.[34] The Supreme Court in Dalehite v. United States held that the discretionary function exception applied to the government’s operation of a program for supplying fertilizer to countries at risk of famine after World War II, when the fertilizer exploded, killed many people, and leveled a town.[35] The Dalehite rule is that the discretionary function exception applies to “more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations.”[36] Superintendent Gustin’s failure to do anything about the goat when nonlethal aversive conditioning had failed falls into none of these immunized categories.
The Court in Indian Towing Co. v. United States limited Dalehite. A tugboat had run aground because the Coast Guard failed for three weeks (not years, as in our case) to discover and repair a bad connection for the light in a lighthouse.[37] The Court held that despite operation of the lighthouse being uniquely governmental, once the government made a policy deci•sion to operate a light at the location, it “was obligated to use due care” in operating and maintaining it.[38] Likewise, the government did not have to establish Olympic National Park, but once it made the policy decision to do so, it was obligated to exercise due care for the safety of the tourists it invited in.
The Supreme Court decisions applying the exception since Indian Towing have all involved high policy and complex regulatory regimes, not garden-variety torts committed in the course of day-to-day operations. All involved supervision by government of the conduct of private individuals, which this case does not. The park regulation prohibiting visitors from carrying guns to protect themselves from dangerous animals is a policy decision regulating the conduct of private individuals,[39] but this case did not involve park policy regulating visitors such as Mr. Boardman, just park execution of its own programs. United States v. Varig Airlines shielded Federal Aviation Administration’s “type certification” allowing Boeing to use its proposed design for its 707 passenger jet,[40] which we relied on in GATX/Airlog Co. v. United States, another type certification case.[41] The Court held that the discretion *1122 ary function exception shields discretionary acts “of the Government acting in its role as a regulator of the conduct of private individuals.”[42] Superintendent Gus-tin failing to deal with the Klahhane Billy’s aggressiveness might be characterized as a regulator of a goat, but not as “a regulator of the conduct of private individuals.” The reason for the “regulator” rule is that Congress, by means of the discretionary function exception, “wished to prevent judicial ‘second-guessing’ of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.”[43]
Likewise in Berkovitz v. United States, the government conduct involved was regulatory, licensing of polio vaccine.[44] The Court held that the exception shielded formulation of policy as to how to regulate release of vaccine, and policy judgments of officials exercising discretion in the application of these policies, but not negligent acts of officials carrying out those policy judgments rather than making them.[45] The Court’s most recent explanation of the discretionary function exception, in United States v. Gaubert, like Varig Airlines, shields government discretion in how it regulates private firms and individuals.[46] The challenge was to how the Federal Home Loan Bank Board exercised its discretion in regulating the reorganization of a failed savings bank. The Court rejected the view that the government’s liability turns on whether the individual making the decision was of a high enough status so that her official responsibilities included an assessment of social, economic, or political policy. “[I]t is the nature of the conduct, rather than the status of the actor that governs whether the exception applies.”[47] And Gaubert rejected, as Berkovitz had, the proposition that if the action involved an element of judgment or discretion, it was shielded. For the exception to apply, the particular exercise of discretion must be “of the kind that the discretionary function exception was designed to shield.... [W]hen properly construed, the exception protects only governmental actions and decisions based on considerations of public policy.”[48] Though “[w]hen established governmental policy ... allows a Government agent to exercise discretion, it must be presumed that the agent’s acts are grounded in policy when exercising that discretion,” the exception does not apply where “the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime.”[49] No regulatory regime was involved in our case, just the day-to-day business of protecting park visitors from unsafe conditions, like the land condition we deemed not to be immunized in Young v. United States.[50]
The majority holds that if no statute or regulation mandates a different conduct, the exception applies as long as one “policy” reason can be articulated to justify the government’s acts. Relying on a statement in Miller v. United States that “[t]he *1123 decision need not be actually grounded in policy considerations, but must be, by its nature, susceptible to a policy analysis,”[51] the majority concludes that “[w]hether Park officials actually took into consideration the policy objectives listed in the Service’s guidelines is irrelevant.” That is, the majority deems it “irrelevant” that Superintendent Gustin did not in fact decide against relocating or shooting the goat because park visitors liked to see the goats, or decide on a park policy to preserve all goats for this reason. The majority “misconstrues Miller in ... fundamental ways.”[52]
We clarified in Bear Medicine v. United States that the quoted language in Miller “was used illustratively to draw a distinction between protected discretionary activities {e.g., selecting the method of supervising savings and loan associations) and unprotected discretionary activities (e.g., driving a car), not to widen the scope of the discretionary rule.”[53] The language was merely “a paraphrase of a section of the Supreme Court’s opinion in United States v. Gaubert”[54] Gaubert did not hold that any decision, so long as it is made by a high-ranking official with poli-cymaking responsibilities, is protected if a single “policy” reason can be adduced before or after to justify the decision. Quite the opposite. It held that “it is the nature of the conduct, rather than the status of. the actor that governs whether the exception applies.”[55] The majority’s approach amounts to adopting the rule that Justice Scalia suggested in his concurring opinion of Gaubert, that the exception shields any choice “that ought to be informed by considerations of social, economic, or political policy and is made by an officer whose official responsibilities include assessment of those considerations.”[56] That is not the law articulated by the majority in Gaubert, nor was dealing with this goat exercise of regulatory authority, as Gaubert was.
To the extent we narrow the waiver of sovereign immunity, as we do in this case, we undermine the congressional decision that “[t]he United States shall be liable ... [for torts] in the same manner and to the same extent as a private individual under like circumstances.”[57] The existence of discretion is of little value for. distinguishing private individuals’ negligence liability from governmental liability. The basic principle of negligence is that one “acts negligently if the person does not exercise reasonable care under all the circumstances,” considering such factors as the foreseeable likelihood of harm, the foreseeable severity of harm that may ensue, and the burden of precautions to eliminate or reduce the risk.[58] The exercise of discretion is the essence of most negligence. The Federal Tort Claims Act extends to the government liability for negligent exercise of discretion, except for the “political, social, and economic judgments that are the unique province of the Government,”[59] generally involving government regulation of private conduct. Congress chose to abolish the federal government’s sovereign immunity for garden- *1124 variety negligence, which necessarily includes such conduct involving the exercise of discretion.
We have developed two principles relevant to the determination whether a challenged government decision was policy-based or susceptible to policy analysis. First, “we have generally held that the design of a course of governmental action is shielded by the discretionary function exception, whereas the implementation of that course of action is not.”[60] The exception does not shield a failure to implement a safety policy even when the policy does not mandate a specific action at a certain time.[61] This follows Indian Towing Co. v. United States, where once the Coast Guard decided to establish a lighthouse, failing to keep it in good working order is not immunized.[62] Second, we may protect a failure to implement a policy if the implementation “itself implicates policy concerns.” [63] To apply this complex test, we ask whether the implementation of an established policy requires objective determinations based on professional and scientific judgment or a weighing of competing public policy considerations.[64]
In this case, no decision was made based on competing public policy considerations to let the goat continue terrorizing the tourists. After the goat killed Mr. Board-man, Dr. Happe, the Park’s chief biologist, wrote a declaration for this lawsuit saying that the goats in the Park were “iconic” and that visitors liked seeing them. But neither she nor any other park personnel submitted any evidence that they had decided, before the goat killed Mr. Board-man, to let the goat stay in the Park for this or any other reason.
We held that the implementation of safety measures itself implicated public policy concerns where the Forest Service in Miller v. United States balanced competing firefighter safety and public safety interests in deciding how to fight multiple forest fires,[65] and where the Army Corp of Engineers in Bailey v. United States balanced its workers’ safety and the public safety interests in deciding when to replace the warning signs in a flooded river.[66] In these eases, protecting the general public would have entailed considerable risk to the lives of the federal workers. And in both, a decision was made based upon deliberation about these considerations. They were not after-the-fact justifications for litigation purposes, like the “policy” claim made in this case.
In Whisnant v. United States, we held that the government’s failure to inspect a grocery store on a naval base periodically and clean up mold was not protected.[67] Whisnant, an employee of government contractor, claimed that he became ill as a result of regular exposure to the toxic mold in the store’s meat department.[68] We held that “the government’s duty to maintain its grocery store as a safe and healthy environment, for employees and customers is not a policy choice of the type the discretionary function exception *1125 shields. Cleaning up mold involves professional and scientific judgment, not decisions of social, economic, or political policy.” [69]
In ARA Leisure Services v. United States, while the Park Service’s decision to design the Denali Park Road without guardrails was protected because the Park had a policy that roads should “lie lightly upon the land,” the Park’s failure to maintain the road in a safe condition was not protected.[70] The road at Thoroughfare Pass in Denali National Park had eroded from an original width of twenty-eight feet to a width of 14.6 feet and had edges so soft to cause a tour bus to go off road and kill passengers.[71] In Bear Medicine v. United States, a member of a tribe was fatally injured when a tree cut by an employee fell and struck him during a private logging operation that the Bureau of Indian Affairs authorized.[72] The BIA was required to ensure that the logging operation complied with the safety regulations, but few employees were formally trained in basic safety procedures and none had been trained in first aid.[73] The government argued that it had a policy of promoting independence in the operation of the Indian Tribes and that its actions were taken due to limited resources. We held that even if the BIA had discretion in its monitoring of the logging operation, its actions in carrying out its responsibilities (i.e., failure to require safety measures or training) were not protected policy judgments.[74] “[Sjafety measures, once undertaken, cannot be shortchanged in the name of policy. Indeed, the crux of our holdings on this issue is that a failure to adhere to accepted professional standards is not susceptible to a policy analysis.”[75] Likewise here, failure to implement established park policy was not itself an immunized policy judgment.
Other' cases have ruled similarly. In Oberson v. United States Department of Agriculture, the discretionary function exception did not protect the Forest Service’s failure to post a warning or remedy a hazard on a snowmobile trail, because it did not involve considerations of public policy.[76] In Soldano v. United States, the exception barred a claim that the Park Service negligently designed a road without warning signs, but it did not immunize the Park’s negligence in setting a speed limit for the road, because the speed limit decision involved “objective safety criteria” in a park road plan.[77] In Summers v. United States, the exception did not protect the Park Service’s failure to warn visitors of hot coals on a beach where fires were permitted, because (as in the case before us) it “resemblefd] more a departure from the safety considerations established in Service policies” than a public policy-based decision.[78] In Bolt v. United States, the Army’s failure to remove snow and ice from parking lot was not protected.[79] All these involved the exercise of discretion, as almost all negligence does. But as in this case, the particular exercise of discretion at issue did not require a weighing of public policy considerations.
*1126 The policies actually enacted for Olympic National Park, before the goat killed Mr. Boardman, prioritized protecting visitors’ lives over protecting killer goats, “iconic” or not, aesthetically pleasing to visitors or not. Under the National Park Service Management Policies, “[t]he saving of human life will take precedence, over all other management actions as the Park Service strives to protect human life and provide for injury-free visits.”[80] This policy could have been otherwise, as in ARA Leisure Services v. United States, a policy to let the road “lie lightly upon the land,” effectively prioritizing aesthetics over human safety.[81] This written, established National Park Service policy prioritizing “human life” and “injury-free visits” “over all other management actions,” applicable to this case, is the sort that has been immunized as “the kind that the discretionary function exception was designed to shield.”[82] It cannot be reconciled with Superintendent Gustin’s prioritizing of an identified single goat, “iconic” or not, over human safety. The National Park Service policy provides that “[t]he means by which public safety concerns are to be addressed is left to the discretion of superintendents and other decision-makers at the park level,” but not whether to address them.[83]
In order to address this policy mandate “to protect human life and provide for injury-free visits,” Olympic National Park adopted a “Nuisance and Hazardous Animal Management Plan.” Superintendent Gustin described this plan as a “guiding document that directs [employees’] activities.” The “Mountain Goat Action Plan” was included in the Animal Management Plan. The goat plan does not say one way or the other whether to kill aggressive and dangerous goats that do not respond to “aggressive hazing.” Since the park staffs killed the goat within a couple of hours of when the goat had killed Mr. Boardman, they obviously did not think the Mountain Goat Action Plan prohibited killing dangerous goats, though it did not say one way or the other. Superintendent Gustin admitted that Klahhane Billy had been managed, and was eventually killed, pursuant to the Nuisance and Hazardous Animal Management Plan.
The Nuisance and Hazardous Animal Management Plan states that individual animals may be controlled or removed only for specific reasons, one of which is to protect human health and safety. It sets forth “a sequence of escalating management intervention and actions” for responding to dangerous animals: (1) public education and training of employees; (2) warnings and advisories; (3) monitoring and observation; (4) exclusion; (5) seasonal, non-emergency closures; (6) emergency closures; (7) aversion training; (8) capture and release; (9) capture and translocation; and (10) animal destruction.
The Park implemented some of the Plan but not all of it. Under step two, rangers verbally warned hikers and placed signs at trail heads. They also monitored the goats under step three. Next, they implemented aversive cohditioning techniques under step seven, such as yelling and throwing rocks. They1 also used paintball and bean-bag guns for aversion training. Nothing worked. All of these techniques failed. The goat just got more aggressive. Yet the Park did not move on to the next steps, relocating or shooting the goat.
*1127 Superintendent Gustin testified that “[i]f the problem isn’t going away or doesn’t seem to be resolved, then we move to the next level or series of levels.” Deputy Superintendent Todd Suess testified that when,aversive conditioning is not working, park employees are supposed to “ramp it up and go on to the next viable action that can be taken.” Dr. Patti Happe said that if aversion training is unsuccessful, her professional opinion is that the animal should be shot or removed. Finally, Richard Olson, a retired park ranger who drafted the Nuisance and Hazardous Animal Management Plan, stated that once aversive conditioning failed, the only logical next step was to shoot or relocate the problem animal. But what everyone agreed should have happened did not happen.
After two years and most of a third tourist season of unsuccessful aversive conditioning, there was nothing left to do, according to park policy, other than shoot or relocate the goat. Indeed, at the beginning of the fatal season after Klahhane Billy butted (but fortunately did not gore) a hiker, Dr. Patti Happe, the Park’s chief biologist, emailed park employees that “it may be time to talk about taking the next step before someone gets hurt.” She emailed the state’s biologist that the goat “has become very habituated and not responding to our efforts to have him keep at a greater distance from people. Recently, he has been becoming increasingly aggressive and park management would like to explore other management options for him, including relocation from the area.” Dr. Happe emailed Superintendent Gustin that the state’s biologist “was very willing to help, is thinking about alternatives ranging from relocation ... or to captivity, and will help with the capture.” Gustin replied, “[t]his sounds like good news.” There was no policy to the contrary, and no policy decision not to kill or relocate the goat. Nothing was done, despite the expert advice by Superintendent Gustin’s chief biologist that something needed to be done and the state’s offer to help, for the rest of the season, until the goat killed Mr. Boardman.
The majority notes the broad purpose of the Organic Act to “conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.”[84] We held in Young v. United States that this broad purpose does not eliminate the need for the Park Service under the more specific policy to give precedence to “saving of human life” and provide for “injury-free visits.”[85] Following Terbush v. United States,[86] we held in Young that “it is not sufficient for the government merely to wave the flag of policy as a cover for anything and everything it does that is discretionary.”[87] Though we noted that some failures to post warning sighs at possible hazards were immunized policy decisions, we held in Young that the discretionary decision not to post a warning of a dangerous condition known to park officials but not to tourists who might encounter it was not immunized by the discretionary function exception.[88] Our case is not a failure-to-warn case, and warning tourists without weapons of the aggressive 370-pound goat would not have done them any good anyway, unless they decided to abandon their visit to the Park. What matters is that the *1128 Organic Act states a broad purpose not inconsistent with the more specific park policy of prioritizing the safety of human life.
As for goats such as Klahhane Billy, the Park Service had already decided that the Organic Act’s goal of “preserving” had no application. The reason was that these goats were not indigenous to the Park. Mountain goats at Olympic National Park were classified as “exotic” species not entitled to protection. Under the National Park Service Management Policies, “[a]ll exotic plant and animal species that are not maintained to meet an identified park purpose will be managed — up to and including eradication — if (1) control is prudent and feasible, and (2) the exotic species ... creates a hazard to public safety.”[89] This policy, and not the broad purpose of conservation, spoke directly to the hazard posed by Klahhane Billy, yet this goat was not “managed up to and including eradication.”
Applicability of the removal or eradication policy was not in doubt. Dr. Happe, the Park’s chief biologist, testified that the Park has “taken a position that [goats] are exotic and they don’t belong here.” In the 1980s, the Park used helicopters to capture and remove over 400 goats, to protect native vegetation and degraded soils. Superintendent Gustin testified that the Park’s goal would have been to eradicate all of the goats, but the capture program was terminated because of a change in the Park’s rules for using helicopters. The government’s catch-all argument about its discretion to conserve government resources, by which it evidently means money and personnel time, is a bit silly, since the failed aversive conditioning took a lot more time and money than the couple of hours and cost of a bullet that the government expended to kill the goat after the goat killed Mr. Boardman. It verges on dark humor to suggest that protecting soil and vegetation from goats was worth using a fleet of helicopters, but protecting humans from one particular identified goat would have degraded the Park and cost too much money.
Though the government now argues, in litigation, that the Park weighed the public’s desire to see goats against the safety risk from Klahhane Billy, that has no support in the record. The record is filled with reports from concerned visitors who had life-threatening encounters with the goat. They certainly did not want to see it again. In June of 2009, a year before the goat killed Mr. Boardman, Dr. Happe emailed Superintendent Gustin that the goat “is definitely negatively impacting the Park visitors ability to experience and enjoy the area trails.” Another park biologist wrote that the goat “could be really scary to many people.”
CONCLUSION
There never was a discretionary decision, so far as the record shows, to delay or decline to relocate or remove the goat. All we have is a few after-the-fact declarations submitted in litigation attempting to show why such a decision, had it been made, would have been justified by policy. The express, promulgated, applicable policies directed removal or destruction of the goat. Glorifying this run-of-the-mill negligence as a government policy decision eviscerates the waiver of sovereign immunity that is the core of the Federal Tort Claims Act. This was not a policy decision like managing a failed bank, preparing fertilizer for shipment to countries ravaged by war, or approving an aircraft design. This was like not getting around to repairing the- light in the lighthouse in Indian Towing Co. v. United States.[90] This case *1129 is analogous to the routine tort case, where a homeowner has a fierce dog that has attacked people and bitten one, but does not get rid of the dog until after it has torn some child’s face off.[91] This was “ordinary garden-variety negligence” that the government must compensate,[92] not “decisions of social, economic, or political policy” for which the statute preserves its immunity.[93]
We should reverse.

. United States v. Gaubert, 499 U.S. 315, 335, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991) (Sca-lia, J., concurring in part and concurring in the judgment).

. 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991).

. 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988).

. 769 F.3d 1047 (9th Cir.2014).

. 400 F.3d 1177 (9th Cir.2005).

. 241 F.3d 1208 (9th Cir.2001).

. 28 U.S.C. § 2674.

. Id. § 2680(a).

. See Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 16 cmt. e (2010) [hereinafter Restatement (Third) of Torts].

. See id. § 7 cmt. b, illus. 1.

. See id. § 23 cmt. i; Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 51 cmt. 1 (2012).

. See Restatement (Third) of Torts, supra note 9, § 26 cmt. n.

. See Restatement (Third) of Torts: Products Liability § 2 cmt. d, cmt. p, illus. 20 (1998).

. 241 F.3d 1208, 1216 (9th Cir.2001).

. ARA Leisure Servs. v. United States, 831 F.2d 193, 196 (9th Cir.1987) (internal quotation marks omitted).

. 28 U.S.C. § 2674.

. Terbush v. United States, 516 F.3d 1125, 1135 (9th Cir.2008) (internal quotation marks omitted).

. 28 U.S.C. § 2680.

. Id. § 2674.

. Id. § 2680(a).

. Bear Medicine v. United States, 241 F.3d 1208, 1214 (9th Cir.2001) (internal quotation marks omitted).

. Whisnant v. United States, 400 F.3d 1177, 1185 (9th Cir.2005).

. Young v. United States, 769 F.3d 1047, 1054 (9th Cir.2014).

. Id.

. Restatement (Third) of Torts, supra note 9, § 14.

. 486 U.S. 531, 542-43, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988). „ •

. Restatement (Third) of Torts, supra note 9, § 16(a).

. See Iwai v. State, 129 Wash.2d 84, 915 P.2d 1089, 1093 (1996).

. Berkovitz v. United States, 486 U.S. 531, 536, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988).

. Id.

. 350 U.S. 61, 68-69, 76 S.Ct. 122, 100 L.Ed. 48 (1955).

. 467 U.S. 797, 814, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984).

. Berkovitz, 486 U.S. at 536, 108 S.Ct. 1954.

. See Portland 76 Auto/Truck Plaza, Inc. v. Union Oil Co. of Cal., 153 F.3d 938, 946 (9th Cir.1998).

. 346 U.S. 15, 42, 73 S.Ct. 956, 97 L.Ed. 1427 (1953).

. Id. at 35-36, 73 S.Ct. 956.

. Indian Towing Co. v. United States, 350 U.S. 61, 62, 76 S.Ct. 122, 100 L.Ed. 48 (1955).

. Id. at 69, 76 S.Ct. 122.

. Cf. 36 C.F.R. § 2.4.

. 467 U.S. 797, 815-16, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984).

. 286 F.3d 1168, 1175, 1178 (9th Cir.2002).

. Varig Airlines, 467 U.S. at 813-14, 104 S.Ct. 2755.

. Id. at 814, 104 S.Ct. 2755.

. 486 U.S. 531, 533, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988).

. Id. at 546-48, 108 S.Ct. 1954.

. United States v. Gaubert, 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991).

. Id. at 322, 111 S.Ct. 1267 (internal quotation marks omitted).

. Id. at 322-23, 111 S.Ct. 1267 (internal quotation marks omitted).

. Id. at 324-25, 111 S.Ct. 1267.

. See 769 F.3d 1047, 1059 (9th Cir.2014).

. 163 F.3d 591, 593 (9th Cir.1998).

. Bear Medicine v. United States, 241 F.3d 1208, 1216 (9th Cir.2001).

. Id. (emphasis added).,

. Id.

. Gaubert, 499 U.S. at 322, 111 S.Ct. 1267 (internal quotation marks omitted).

. Id. at 335, 111 S.Ct. 1267 (Scalia, J., concurring in part and concurring in the judgment).

. 28 U.S.C. § 2674.

. Restatement (Third) of Torts, supra note 9, § 3.

. Bear Medicine, 241 F.3d at 1214 (internal quotation marks omitted).

. Whisnant v. United States, 400 F.3d 1177, 1181 (9th Cir.2005).

. ARA Leisure Servs. v. United States, 831 F.2d 193, 195 (9th Cir.1987).

. 350 U.S. 61, 69, 76 S.Ct. 122, 100 L.Ed. 48 (1955).

. Terbush v. United States, 516 F.3d 1125, 1133 (9th Cir.2008) (quoting Whisnant, 400 F.3d at 1182 n. 3).

. Soldano v. United States, 453 F-3d 1140, 1148 (9th Cir.2006); Whisnant, 400 F.3d at 1181.

. 163 F.3d 591, 595-96 (9th Cir.1998).

. '623 F.3d 855, 861-62 (9th Cir.2010).

. 400 F.3d 1177, 1183 (9th Cir.2005).

.Id. at 1179.

. Id. at 1183.

. 831 F.2d 193, 195 (9th Cir. 1987).

. Id.

. 241 F.3d 1208, 1215 (9th Cir.2001).

. Id. at 1212.

. Id. at 1215.

. Id. at 1216-17 (internal quotation marks omitted).

. 514 F.3d 989, 998 (9th Cir.2008).

. 453 F.3d 1140, 1147 (9th Cir.2006).

. 905 F.2d 1212, 1216 (9th Cir.1990).

. 509 F.3d 1028, 1034 (9th Cir.2007).

. Nat'l Park Serv., Management Policies 2006, § 8.2.5.1.

. See 831 F.2d 193, 195 (9th Cir.1987).

. Berkovitz v. United States, 486 U.S. 531, 536, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988).

. Nat'l Park Serv., Management Policies 2006, § 8.2.5.1.

. 16U.S.C. § 1.

. 769 F.3d 1047, 1056, 1057 (9th Cir.2014).

. 516 F.3d 1125, 1130 (9th Cir.2008).

. 769 F.3d at 1057 (internal quotation marks omitted).

. Id. at 1057, 1058.

. Nat’l Park Serv., Management Policies 2006, § 4.4.4.2.

. See 350 U.S. 61, 69, 76 S.Ct. 122, 100 L.Ed. 48 (1955).

. See, e.g., King v. Breen, 560 So.2d 186 (Ala.1990).

. See ARA Leisure Servs. v. United States, 831 F.2d 193, 196 (9th Cir.1987) (internal quotation marks omitted).

. See Whisnant v. United States, 400 F.3d 1177, 1183 (9th Cir.2005).