**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| DONNA YOUNG; GERALD YOUNG, husband and wife, and as guardians for minor child J.Y., *Plaintiffs-Appellants*, <br><br> v. <br><br> UNITED STATES OF AMERICA, *Defendant-Appellee*. | No. 13-35287 <br><br> D.C. No. 3:11-cv-06043-BHS <br><br><br> OPINION |

Appeal from the United States District Court
for the Western District of Washington
Benjamin H. Settle, District Judge, Presiding

Argued and Submitted
July 11, 2014—Seattle, Washington

Filed October 17, 2014

Before: Arthur L. Alarcón, A. Wallace Tashima,
and Mary H. Murguia, Circuit Judges.

Opinion by Judge Murguia

**SUMMARY**[*]

**Federal Tort Claims Act**

The panel reversed the district court's dismissal for lack of subject matter jurisdiction of a Federal Tort Claims Act action brought against the United States for negligently failing to warn visitors at Mount Rainier National Park of a known hazard.

Donna Young sustained severe injuries when she fell into a twelve-foot-deep hole that had formed underneath the snow near a buried transformer in an area near the Park's main visitor center, and she sued the United States for damages relating to the injuries. The district court dismissed Young's complaint as barred by the discretionary function exception to the Federal Tort Claims Act ("FTCA").

The panel held that the National Park Service's decision not to warn of the known hazard was not susceptible to policy considerations, and therefore it was not protected under the discretionary function exception to the FTCA. The panel held that the district court erred in determining, at least at this stage, that it lacked jurisdiction over the case. The panel remanded for further proceedings.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Wayne Mitchell, Anderson & Mitchell PLLC, Seattle, Washington, for Plaintiffs-Appellants.

Priscilla To-Yin Chan (argued), Assistant United States Attorney; Jenny A. Durkan, United States Attorney, Seattle, Washington, for Defendant-Appellee.

**OPINION**

MURGUIA, Circuit Judge:

Plaintiffs Donna and Gerald Young and their minor daughter J.Y. appeal the district court's order dismissing their complaint against the United States for negligently failing to warn visitors at Mount Rainier National Park of a hazard that the National Park Service both knew of and created. Donna sustained severe injuries when she fell into a twelve-foot-deep hole that had formed underneath the snow in an area near the Park's main visitor center. The Youngs sued the United States for damages relating to Donna's injuries, but the district court dismissed their complaint for lack of subject matter jurisdiction, finding the action barred by the discretionary function exception to the Federal Tort Claims Act. *See* 28 U.S.C. § 2680(a). On appeal, the United States maintains that the Park Service's decision not to warn of the hazard was policy-driven—that is, guided by policies relating to access, historic and natural resource preservation, and conservation—and is therefore protected under the discretionary function exception. We conclude that the Park Service's decision not to warn of the known hazard was not susceptible to those policy considerations and therefore is not

protected under the exception.  Accordingly, we reverse the district court's judgment and remand this case for further proceedings.

## I.  Facts and Procedural History

Mount Rainier National Park ("the Park") was established in 1899 as the fifth national park in the United States.  Over 97 percent of the Park's 235,000 acres is dedicated wilderness area, while the remaining three percent includes developed areas such as roadways and visitor centers.  In 1997, the entire park was designated as a National Historic Landmark District.

Each year, the Park receives about 1.5 to 2 million visitors, many of whom have little or no experience with alpine environments.  Most of those visitors stop at the Jackson Visitor Center (JVC), the Park's most popular visitor area, at some point during their stay.  The JVC is located in an area of the Park known as "Paradise," which is situated on the southern slope of Mount Rainier and receives an average annual snowfall of 641 inches.  In recent years, Paradise has been called "one of the snowiest places on the planet."

When the JVC was constructed in 2008, the National Park Service (NPS or "the Park Service") installed a transformer nearby to power the visitor center building.  The NPS installed the transformer approximately 150 feet away from the visitor center building in a snowfield across a two-lane road that services the area.  According to NPS staff, the area in which the transformer is located is "accessible but it's not attractive,"; "[i]t's not one of the areas that [the NPS] develop[s] and maintain[s] to get people out of the parking lot and onto the snow."  The transformer operates year-round,

releasing heat as it transfers electricity from nearby power lines to the JVC building.

The snowfield in which the transformer is located often accumulates more snow than other areas of the Park, because the NPS's road-plowing operations deposit snow there during in the winter. As a result, the field generally is covered in snow between November and mid-July. At one point, the area surrounding the transformer was marked with stakes so that the Park's snowplow operator would know where the transformer was located; the Park's staff was afraid that "the weight of the [snowplow], which is considerable, could collapse onto the transformer" underneath the snow. At the time of the incident giving rise to this appeal, there were no warning signs at or near the transformer's location.

Plaintiffs Donna and Gerald Young and their minor daughter J.Y. live in Santa Clara, California. In June 2010, they decided to "explore the Northwest" and travel to Washington. While in Washington they visited Mount Rainier National Park, where they hoped to "look around a little bit" and get their National Park Passport Books stamped at the JVC. They arrived at the Park in the early evening, just before the JVC was scheduled to close.

After the Youngs had parked their car, Donna and J.Y. went into the visitor center, looked around, got their passport books stamped, and then left the JVC to look for Gerald outside. They found Gerald standing in the snowfield across the road, where he was taking pictures of the mountain views. J.Y. walked away from her parents to explore snowfield. While she was exploring, she found a small hole, about two or three inches in diameter, in the snow. She asked Donna to come look at it.

When Donna approached the hole, the snow beneath her collapsed, and she fell approximately twelve feet, landing on a concrete pad on the ground underneath the transformer. According to the NPS Case Incident Record documenting Donna's fall, the transformer's heat had caused the snow above it to "mel[t] out," creating a large cavity beneath a "snow ceiling [that] was thin directly overtop of the transformer." Donna suffered severe injuries as a result of the fall.

Plaintiffs sued the United States under the Federal Tort Claims Act (FTCA), which permits individuals to sue the government for money damages to compensate for injuries arising out of the negligent acts of government employees. *See* 28 U.S.C. § 1346(b)(1). In their complaint, Plaintiffs alleged that the NPS negligently failed to warn Plaintiffs of a known, latent hazard (the transformer) the agency had created in the area of the JVC. Plaintiffs sought damages for physical injuries, medical costs, economic losses, pain and suffering, and loss of consortium.

The government moved to dismiss Plaintiffs' complaint for lack of subject matter jurisdiction, *see* Fed. R. Civ. P. 12(b)(1), arguing that Plaintiffs' claim was barred by the discretionary function exception to the FTCA, *see* 28 U.S.C. § 2680(a) (excepting from the FTCA's waiver of immunity "[a]ny claim based upon . . . the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused"). According to the government, the NPS's decision not to place warning signs in the area of the transformer was a discretionary, policy-driven decision involving

consideration of "NPS's policies and practices with respect to the discovery, warning and elimination of hazards."

The district court, applying the two-step test established in *Berkovitz v. United States*, 486 U.S. 531, 536–37 (1988), for determining whether the discretionary function exception protected the agency's actions, granted the government's motion to dismiss. The court concluded that the NPS's decisions regarding "maintenance of the Park, decisions to identify and warn visitors from hazards, and the protection of visitors from hazards" were policy-driven decisions protected under the exception. Plaintiffs timely appealed the district court's order.

## II. Standard of Review

We review de novo the district court's order dismissing Plaintiffs' complaint for lack of subject matter jurisdiction. *Terbush v. United States*, 516 F.3d 1125, 1128 (9th Cir. 2008). In doing so, we generally accept as true the factual allegations of Plaintiffs' complaint and ask "whether the allegations state a claim sufficient to survive a motion to dismiss." *United States v. Gaubert*, 499 U.S. 315, 327 (1991) (citing *Berkovitz*, 486 U.S. at 540). Allegations of jurisdictional facts, however, are not afforded presumptive truthfulness; on a motion to dismiss for lack of subject matter jurisdiction, the court may hear evidence of those facts and "resolv[e] factual disputes where necessary." *Robinson v. United States*, 586 F.3d 683, 685 (9th Cir. 2009) (internal quotation marks omitted) (alteration in original); *see also Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983). We ordinarily review those factual findings for clear error. *Robinson*, 586 F.3d at 685.

When the jurisdictional motion "involv[es] factual issues which also go to the merits," a court should employ the standard applicable to a motion for summary judgment because "resolution of [those] jurisdictional facts is akin to a decision on the merits." *Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983). In that posture, the moving party "should prevail only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Id.* Although Plaintiffs bear the initial burden to establish subject matter jurisdiction under the FTCA, it is the government's burden to establish that the discretionary function exception applies. *Oberson v. U.S. Dep't of Agric.*, 514 F.3d 989, 997 (9th Cir. 2008).

In this case, the question whether the Park Service knew or should have known of the hazard created by the transformer is a disputed issue of jurisdictional fact that is "so intertwined" with the substantive dispute that resolution of the former depends, at least in part, on resolution of the latter. *See Augustine*, 704 F.2d at 1077 ("[W]here the jurisdictional issue and the substantive issue are so intertwined that the question of jurisdiction is dependent on factual issues going to the merits, the jurisdictional determination should await a determination of the relevant facts on either a motion going to the merits or at trial."). Thus, if the fact of the Park Service's knowledge of the hazard changes our analysis as to whether the discretionary function exception applies, then Plaintiffs' complaint should not have been dismissed at this stage, and the question of jurisdiction instead should have awaited a determination on the merits.

## III. Analysis

FTCA waives the government's immunity from suits arising out of certain negligent acts of federal employees. *See* 28 U.S.C. § 1346(b)(1).[1]  The government's immunity is restored, however, under what is known as the "discretionary function exception," with respect to claims arising out of certain discretionary duties of federal agencies and employees. *See* 28 U.S.C. § 2680(a).  The exception excludes from the FTCA's waiver of immunity

> [a]ny claim based upon . . . the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

*Id.*

To determine whether a particular claim is barred by the FTCA's discretionary function exception, we must conduct

---

[1] Specifically, the FTCA waives the government's immunity with respect to claims for money damages for

> injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1).

a two-step inquiry. *See Berkovitz*, 486 U.S. at 536–37. At the first step, we must consider whether the agency's allegedly negligent conduct is discretionary—that is, "whether the action is a matter of choice for the acting employee." *Id.* at 536. Conduct is not discretionary unless it "involves an element of judgment or choice." *Id.* Thus, the exception will not apply "when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow" but the employee fails to follow it. *Id.* At the second step, we must determine whether the particular exercise of discretion was "of the kind that the discretionary function exception was designed to shield." *Id.* The decision must be one that is "grounded in social, economic, and political policy." *Id.*

"Whether a challenged action falls within the discretionary function exception requires a particularized analysis of the specific agency action challenged." *GATX/Airlog Co. v. United States*, 286 F.3d 1168, 1174 (9th Cir. 2002). Thus, before turning to *Berkovitz*'s two-step inquiry, we must first identify Plaintiffs' "specific allegations of agency wrongdoing." 486 U.S. at 540. To identify the particular agency conduct with which Plaintiffs take issue, we look to the allegations of Plaintiffs' complaint. *See Whisnant v. United States*, 400 F.3d 1177, 1184–85 (9th Cir. 2005).

In their complaint, Plaintiffs alleged that the Park Service employees were negligent "when they failed to protect Donna Young from falling into the sinkhole caused by the transformer, failed to warn Donna Young of the presence of the latent, dangerous sinkhole, and failed to make the area safe for visitors." Plaintiffs further alleged that Park Service employees knew or should have known that the transformer would emit heat, that it would thereby create a large cavern

in the snow, and that park visitors would walk on the snow in the area of the hazard. In other words, Plaintiffs alleged that the Park Service was negligent in failing to warn of a hazard that it both knew of and created.

The district court framed Plaintiffs' allegations more broadly, however. It concluded that "the conduct at issue is the NPS's maintenance of the Park, decisions to identify and warn visitors from hazards, and the protection of visitors from hazards." Framed in that way, the district court assessed whether NPS's decisions about whether to warn the public of "hazards of a general nature within the park, whether known or unknown" and however created, were policy driven. Plaintiffs take issue with that characterization, contending that it fails to account for their allegations that the agency knew of the hazard and created it. We agree.

Our cases make clear that when determining whether the discretionary function exception applies in a particular case, "the question of how the government is alleged to have been negligent is critical." *Whisnant*, 400 F.3d at 1185. Had Plaintiffs actually alleged, for example, that the NPS was negligent in failing to warn of any danger, whether known or unknown and however created, their claim would likely be barred, just as the district court concluded. *See, e.g.*, *Terbush*, 516 F.3d at 1137; *Blackburn v. United States*, 100 F.3d 1426. 1434 (9th Cir. 1996); *Valdez v. United States*, 56 F.3d 1177, 1178 (9th Cir. 1995); *Childers v. United States*, 40 F.3d 973, 975 (9th Cir. 1994). But that is not what Plaintiffs alleged. Instead, they alleged that the government was negligent in failing to warn of a particular danger that it knew of and created—allegations that, in our view, are meaningfully different because they encompass conduct that may not be shielded by the Park Service's broad discretion. The

distinction is therefore important, and the district court erred in mischaracterizing Plaintiffs' allegations.

Nonetheless, the government urges us to adopt the district court's broad characterization, lest the analysis "impermissibly collaps[e] the discretionary-function inquiry into a question of whether the government was negligent." But the government misses the point. We recognize, as we have before, that "the question of *whether* the government was negligent is irrelevant to the applicability of the discretionary function exception." *Whisnant*, 400 F.3d at 1185. By contrast, the question of *how* the government was negligent remains "critical" to the discretionary function exception inquiry—indeed, determining the precise action the government took or failed to take (that is, how it is alleged to have been negligent) is a necessary predicate to determining whether the government had discretion to take that action. *See generally id.*

In our view, the "specific allegatio[n] of agency wrongdoing" that we must use in determining whether the discretionary function exception applies in this case is Plaintiffs' allegation that NPS staff failed to warn of a known, latent hazard that the agency itself created. With that allegation of wrongdoing in mind, we turn to the *Berkovitz* two-step inquiry.

**A.**

In this case, the analysis at *Berkovitz*'s first step—whether the decision at issue "involve[d] an element of judgment or choice"—is relatively straightforward. The parties agree that the Park's decision not to place warnings signs at or near the transformer was a discretionary decision. Neither party

identifies any statute, regulation, or policy prescribing any specific course of conduct for warning against hazards the agency created. The conduct was therefore a matter of choice for the Park Service staff and was discretionary under *Berkovitz*.

## B.

The parties' dispute lies in the analysis at *Berkovitz*'s second step—whether the decision was policy-driven. *See* 486 U.S. at 536–37. The discretionary function exception protects against "judicial 'second-guessing' of legislative and administrative decisions" only in certain circumstances. *Id.* (quoting *United States v. Varig Airlines*, 467 U.S. 799, 814 (1984)). Such instances generally involve decisions that are "based on considerations of public policy"—specifically, "social, economic, and political policy." *Id.* at 537.

Our court has acknowledged the "weaving lines of precedent regarding what decisions are susceptible to social, economic, or political policy analysis," particularly in cases in which the allegation of agency wrongdoing involves a failure to warn. *Whisnant*, 400 F.3d at 1181. We have noted that "Government actions can be classified along a spectrum, ranging from those 'totally divorced from the sphere of policy analysis,' such as driving a car, to those 'fully grounded in regulatory policy,' such as the regulation and oversight of a bank." *Id.* (quoting *O'Toole v. United States*, 295 F.3d 1029, 1035 (9th Cir. 2002)).

We begin by reviewing the specific policies that the government contends formed the basis of the agency's decision. The government first points to the Organic Act,

16 U.S.C. §§ 1–4, the statute through which the National Park Service was created. The Organic Act provides,

> The service thus established shall promote and regulate the use of the Federal areas known as national parks, monuments, and reservations hereinafter specified, . . . by such means and measures as conform to the fundamental purpose of the said parks, monuments, and reservations, which purpose is to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

16 U.S.C. § 1. We have recognized that the Organic Act "sets forth the broad policy considerations that govern NPS's management of national parks" and that, under the Organic Act, "[m]uch of the NPS's work is 'grounded' in [a] broad mandate to balance conservation and access." *Terbush*, 516 F.3d at 1130.

The government also relies on more specific policies, all of which were established pursuant to the NPS's authority under the Organic Act, to justify its decision not to warn of the hazard created by the transformer. Specifically, it points to the NPS's 2006 Management Policies and the NPS's Director's Order #50C as additional bases for its conduct.

The NPS's 2006 Management Policies apply nationwide and, like the Organic Act, also require the NPS, in providing for visitor safety, to balance its safety measures against considerations of conservation and access:

> The saving of human life will take precedence over all other management actions as the Park Service strives to protect human life and provide for injury-free visits. The Service will do this within the constraints of the 1916 Organic Act. The primary—and very substantial—constraint imposed by the Organic Act is that discretionary management activities may be undertaken only to the extent that they will not impair park resources and values.

The policies go on to state that, at the park-specific level, "[t]he means by which public safety concerns are to be addressed is left to the discretion of superintendents and other decision-makers . . . who must work within the limits of funding and staffing." "Examples include decisions about whether to install warnings signs . . . ." Similarly, under Director's Order #50C, park superintendents must "use their discretion to determine the level of program resources and the types of programs needed to manage visitor risk within their park." "Superintendents should strive to minimize the frequency and severity of visitor incidents by developing a range of appropriate prevention strategies . . . includ[ing] . . . where appropriate, feasible, and consistent with the park mission, providing warnings about dangerous conditions (e.g., weather, construction areas) that may cause risk to visitors." Director's Order #50C specifies that superintendents should exercise that discretion in light of "NPS policies relating to public safety, health, and the environment."

Against the backdrop of those and other related agency policies, our cases have identified important distinctions

between protected and unprotected agency actions. The NPS's decisions with respect to the design and construction of roadways and trails, for example, are discretionary decisions that are "clear[ly] link[ed]" to social and political policies relating to access and resource preservation. *ARA Leisure Servs. v. United States*, 831 F.2d 193, 195 (9th Cir. 1987); *see also Terbush*, 516 F.3d at 1137 (holding that the NPS's decision not to warn of a rockfall hazard involved a "process of identifying and responding to hazards in the wild" and "implicate[d] the NPS's broader policy mandates to balance access with conservation and safety"); *Childers*, 40 F.3d at 975 (concluding that the NPS's decision not to warn of unmaintained trails was "inextricably linked to central policy questions" relating to access and preservation). Such decisions are therefore protected under the discretionary function exception.

NPS decisions not to provide warnings at other natural features within the national parks, even where the NPS has provided access to those features, may likewise be protected. In *Valdez v. United States*, the plaintiffs sued the United States alleging a failure to erect barriers at the top of certain waterfalls in Kings Canyon National Park and a failure to warn of the dangers the waterfalls posed to the public. 56 F.3d at 1178. Relying on *Childers*, we held that the NPS's decision not to warn of natural, obvious risks "clearly implicates a choice between the competing policy considerations of maximizing access to and preservation of natural resources versus the need to minimize potential safety hazards." *Id.* at 1180. A year later, we held that the NPS's decision not to warn of the dangers of diving off Stoneman Bridge at Yosemite National Park was protected by the discretionary function exception because the decision was "based on considerations of visitor enjoyment, preservation

of the historical features of the bridge, the need to avoid a proliferation of man-made intrusions, and protection of wildlife and the general riparian environment." *Blackburn*, 100 F.3d at 1434.

Those cases suggest that, when the NPS decides whether to warn of dangers that exist naturally in its national parks, those decisions generally are guided by considerations of policy. The NPS must balance, for example, its purpose to provide visitor access to park resources against its need to protect the public from harm. It must also consider its obligation to preserve the natural environment "for the enjoyment of future generations." *See* 16 U.S.C. § 1. And, at times, it must consider how best to protect wildlife and park ecosystems and to preserve historical features of the lands it maintains.

But those policies, while crucial to the NPS's operations, cannot shield every decision the Park Service makes. For that reason, we have declined to "quickly accept that every minute aspect of the NPS's work is touched by the policy concerns of the Organic Act." *Terbush*, 516 F.3d at 1130. Because "[i]t is not sufficient for the government merely to [wave] the flag of policy as a cover for anything and everything it does that is discretionary," we have demanded "some support in the record" that the particular decision the NPS made was actually susceptible to analysis under the policies the government identified. *Id.* at 1134. Cases in which the government cannot provide such support delimit the scope of the discretionary function exception's reach.

*Summers v. United States* was such a case. In *Summers*, the plaintiffs alleged that the government had failed to warn visitors at Rodeo Beach of the hazards of stepping on hot

coals at the beach's fire pits. 905 F.2d 1212, 1214 (9th Cir. 1990). The government, in response, offered "no evidence . . . that NPS's failure to post warnings of the sort that would have prevented [the plaintiff's] injury was the result of a decision reflecting the competing considerations of the Service's sign policy." *Id.* at 1215. Finding "nothing in the record to indicate that the failure to provide signs resulted from a decision grounded in economic, social, or political policy," we concluded that the government's failure to warn was not protected by the discretionary function exception. *Id.* at 1215–16. We reached a similar conclusion in *Oberson v. United States Department of Agriculture*, 514 F.3d at 997–98, noting that the government offered "no evidence to show that its failure to post a warning [at the location of a known hazard] was the result of a policy decision."

Our decision in *Sutton v. Earles*, 26 F.3d 903, 910 (9th Cir. 1994), also dealt with a circumstance in which the agency's decision was not susceptible to policy analysis. In *Sutton*, we held that the Navy's failure to post speed limit signs after it placed buoys in navigable waterways was not protected by the discretionary function exception. Faced with a circumstance where, as here, the hazard at issue was both known to and created by the agency, we concluded that the agency's decision not to warn of that hazard was not policy-based. Specifically, we held that "[a] decision not to warn of a specific, known hazard for which the acting agency is responsible is not the kind of broader social, economic or political policy decision that the discretionary function exception is intended to protect." *Id.*

\*   \*   \*   \*   \*

Relying on those cases to guide our analysis, we must decide where this case falls along the spectrum of government conduct we have described.  We conclude that the NPS's decision not to warn of the latent dangers associated with the transformer near the JVC was a decision "totally divorced" from the policies that the government has identified as the basis for its decision.  *See Whisnant*, 400 F.3d at 1181.  In so doing, we reject the government's argument that its decision required it to "balance safety, access, and preservation" in making judgments about (1) managing snow, (2) prioritizing inspections, (3) prioritizing and responding to hazards once identified, and (4) deciding "what signs, poles, fences or other barriers would best educate, deter and prevent the public from accessing places where hazards may be found."

We have little doubt that NPS staff members make discretionary decisions every day about managing snow, prioritizing inspections, and responding to hazards.  But those decisions are not at issue in this case, so we reject the government's efforts to make this case about them.  Relying, as we must, on the facts alleged in Plaintiffs' complaint, this case is about the NPS's decision not to place a warning sign at the location of the buried transformer, even though the NPS knew that the transformer emitted heat, knew that it was buried under twelve feet of snow, and knew that it was located right across the road from the Park's most popular visitor area.  The NPS's decision in that respect is not susceptible to considerations of any social, economic, or political policy that the government has identified.

As noted, the government argues that its decision was driven by policy considerations relating to access, historic and natural resource preservation, and conservation.  It

contends that this case is just like *Childers*, *Blackburn*, and *Valdez*—cases in which the agency had failed to warn in circumstances that we found to implicate considerations of access, resource preservation, and conservation.    *See Childers*, 40 F.3d at 975–76 (unmaintained trails relate to access and resource preservation); *Blackburn*, 100 F.3d at 1434 (historic bridge relates to access, preservation, and the environment); *Valdez*, 56 F.3d at 1180 (barriers atop waterfalls relate to access and resource preservation).    But here, those considerations are irrelevant.

The snowfield in which the transformer is located is approximately 150 feet from the visitor center building. While the snowfield is accessible—and, indeed, often accessed—NPS staff members claim that it is "not attractive." While the NPS was aware that visitors can access the area, the area is "not one of the areas that [the NPS] develop[s] and maintain[s] to get people out of the parking lot onto the snow."    In other words, although visitors access the area of the transformer, the NPS does not *seek* to provide access to it. Thus, this is not a case in which the government is faced with policy considerations related to providing access to visitors in the face of known dangers.

This is also not a decision susceptible to policy matters such as historic or natural resource preservation.    NPS staff members suggest that their decisions about where to place warning signs throughout the Park are often affected by their responsibility to protect the "look and feel of [the] historic district" and the "natural environment [and] the ecosystem." They note that "[t]he superintendent has the discretion to act upon hazards that would help prevent serious injury or fatality based on a number of things, and that includes the mission of what our legal mandate is, which is to protect –

protect the park resources and the values that are in the park, and to ensure that they're going to be there for future generations." But their decision not to warn about the dangers associated with the transformer—infrastructure that itself takes away from the "look and feel of the historic district"—cannot reasonably be "linked" to those policies. Where, as here, the hazard is not located "in the wild," *see Terbush*, 516 F.3d at 1137, has no connection to visitor enjoyment or "protection of wildlife and the general alpine environment," *see Blackburn*, 100 F.3d at 1434, and was created by the agency itself, the Park Service's decision not to warn can only be considered "totally divorced" from the policies on which it purports to rely, *see O'Toole*, 295 F.3d at 1035.

## IV.  Conclusion

The Organic Act and the regulations promulgated pursuant to its directive afford the National Park Service substantial discretion in making decisions related to the operation of our national parks. In making those decisions, NPS staff must consider policies concerning access; visitor enjoyment; historical, wildlife, and natural resource preservation; and conservation. 16 U.S.C. § 1. Above all, however, the Park Service must "striv[e] to protect human life and provide for injury-free visits." Where, as here, warning against a hazard known to and created by the NPS would not implicate concerns for access, visitor enjoyment, or environmental preservation, the *only* policy the NPS must consider is one it appears to have ignored: visitor safety.

In a similar case, we stated that

> a failure to warn involves considerations of
> safety, not public policy.  It would be wrong
> to apply the discretionary function exception
> in a case where a low-level government
> employee made a judgment not to post a
> warning sign, or to erect a guardrail, or to
> make a safer path.  Such a judgment would be
> no different than a judgment made by a
> private individual not to take certain measures
> to ensure the safety of visitors.  To interpret
> such a judgment as discretionary would be too
> expansive an interpretation of [Congress's]
> intent in creating the discretionary function
> exception.

*Faber v. United States*, 56 F.3d 1122, 1125 (9th Cir. 1995).
Here, there is no apparent connection between the agency's
decision and the policies it identifies as the basis for that
decision.  The only rationale for protecting the decision
therefore "falls away."  *See ARA Leisure Servs.*, 831 F.2d at
195.  For that reason, we conclude that the NPS's decision
not to warn of a hazard that it knew of and created—and that
it placed near a visitor center serving 1 million visitors
annually—cannot be shielded by the FTCA's discretionary
function exception.[2]  Because that is so, the district court
erred in determining, at least at this stage, that it lacked
jurisdiction over this case.  We therefore reverse the district

---

[2] Construing the facts in the light most favorable to the Plaintiffs, as we
are required to do under *Augustine*, 704 F.2d at 1077, we assume that the
Park Service knew of the hazard created by the transformer.

court's judgment and remand the case for further proceedings.

**REVERSED AND REMANDED.**