FOR PUBLICATION

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

YOON SUK CHANG,

    *Plaintiff - Appellant*,

v.

UNITED STATES OF AMERICA,

    *Defendant - Appellee*.

No. 24-1799

D.C. No.
1:21-cv-00037

OPINION

Appeal from the District Court
for the Northern Mariana Islands
Ramona V. Manglona, Chief District Judge, Presiding

Argued and Submitted February 14, 2025
Honolulu, Hawaii

Filed June 9, 2025

Before: Sidney R. Thomas, Daniel A. Bress, and Ana de
Alba, Circuit Judges.

Opinion by Judge Bress;
Dissent by Judge S.R. Thomas

## SUMMARY[*]

### Federal Tort Claims Act

The panel reversed the district court's judgment dismissing, based on the discretionary function exception of the Federal Tort Claims Act ("FTCA"), Yoon Suk Chang's complaint against the United States seeking to recover for injuries he sustained at the American Memorial Park on Saipan in the Northern Mariana Islands.

Chang alleged negligence under the FTCA based on the National Park Service "allowing a dangerous hole to go unrepaired."

Under the FTCA, the United States is liable for the negligent acts of its employees, but not if the claim is "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty." 28 U.S.C. § 2680(a).

The panel held that the discretionary function exception did not preclude a lawsuit by a man who was injured when his foot was caught in a large divot in a regularly maintained recreational grass field at a national park in Saipan because the routine maintenance of a grassy lawn did not involve government employees balancing public policy considerations.

Dissenting, Judge S.R. Thomas would hold that the discretionary function exception to the FTCA applied where the standard to which the Park employees chose to keep the

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

grassy areas necessarily required decisions based on public policy concerns.

## COUNSEL

Bruce Berline (argued), Law Office of Bruce Berline LLC, Saipan, Northern Mariana Islands, for Plaintiff-Appellant.

Mikel W. Schwab (argued), Assistant United States Attorney; Shawn N. Anderson, United States Attorney; Office of the United States Attorney, Hagåtña, Guam, for Defendant-Appellee.

## OPINION

BRESS, Circuit Judge:

Under the Federal Tort Claims Act (FTCA), the United States is liable for the negligent acts of its employees, but not if the claim is "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty." 28 U.S.C. § 2680(a). We are asked to decide if this "discretionary function" exception precludes a lawsuit by a man who was injured when his foot was caught in a large divot in a regularly maintained recreational grass field at a national park in Saipan. Because the routine maintenance of a grassy lawn does not involve government employees balancing public policy considerations, we hold that the discretionary function exception does not apply.

I

American Memorial Park is a 139-acre national park on the island of Saipan in the Northern Mariana Islands. Managed by the National Park Service (NPS), the United States established the Park to honor Americans and Marianans who fought in the Marianas Campaign of World War II. Visitors to the Park can enjoy its open spaces, sports fields, picnic areas, mangrove forest, walking paths, beaches, memorial sites, and visitor center.

As relevant here, American Memorial Park features a large lawn area near an amphitheater. Surrounded by sidewalks, this grassy space is one of the Park's most popular areas for play and amusement. Although the terrain is not perfectly level, the area in question looks like the kind of recreational space that one would customarily find in a suburban park, as this photo from the record reflects:



As the photo also reflects, the NPS regularly maintains the lawn area. One to three laborers work at the Park each day, and the grass is regularly mowed. Park laborer Abram Togawa averred that he "routinely maintain[ed] this area." According to Togawa, he was "trained to look for imperfections while maintaining Park grounds," and "[w]hen imperfections are discovered, they are marked and filled in with dirt, rocks[,] or a combination of both." Park Superintendent Barbara Alberti similarly explained that "[t]he Park's grounds, sidewalks, and walkways[] are subject to informal visual inspection by Park staff, including maintenance staff . . . . Park employees are instructed to report any observed conditions of note, including potential hazards, to the maintenance staff for further review and possible repair in a timely fashion."

On December 8, 2019, Yoon Suk Chang, a citizen of South Korea and three-decade resident of the Northern Mariana Islands, visited American Memorial Park with his two young sons. Chang and his children played on the grassy area near the amphitheater. According to Chang, as he began to follow his 5-year-old son toward the parking lot, his foot fell into a one-foot-deep hole in the grass. Chang tumbled violently to the ground. He suffered severe ankle injuries that eventually required surgery in South Korea, where he was hospitalized for five days and spent three months recuperating. In addition to incurring substantial medical expenses, Chang claims his injuries led to additional financial loss because he was no longer able to engage in his chosen line of work in the Saipan construction industry.

In March 2021, Chang filed an administrative tort claim under the FTCA, which the government denied. Chang then filed this action against the United States in federal court in the Northern Mariana Islands. Chang brought a negligence

claim under the FTCA based on the NPS "allowing a dangerous hole to go unrepaired." He requested damages of $1,000,000.

The district court granted the government's motion to dismiss based on the FTCA's discretionary function exception. In the district court's view, although Park employees "do undertake inspection of the grassy [Park] areas, how they choose to do so, how often, *and the standard to which they choose to keep the grassy areas* . . . necessarily required decisions based on public policy concerns." Citing the declarations of Park Superintendent Alberti and maintenance staff member Togawa, the district court concluded that Park employees' "decisions on how often to inspect the grassy areas, how and when to fill any discovered holes, and most importantly *if holes warrant repair*, require [Park] employees to weigh policy considerations of safety, public access, [and] aesthetics, among others." The district court therefore determined that the discretionary function exception applied.

Chang appeals. Our review is de novo. *Young v. United States*, 769 F.3d 1047, 1052 (9th Cir. 2014).

## II

### A

The United States may be sued only to the extent it has waived its sovereign immunity. *O'Toole v. United States*, 295 F.3d 1029, 1033 (9th Cir. 2002) (citing *United States v. Orleans*, 425 U.S. 807, 814 (1976)). The FTCA waives sovereign immunity "from suits arising out of certain negligent acts of federal employees." *Young*, 769 F.3d at 1053 (citing 28 U.S.C. § 1346(b)(1)). The FTCA allows a plaintiff to recover money damages from the federal

government for "personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b)(1). The FTCA thus makes the United States liable "if a private person[] would be liable to the claimant in accordance with the law of the place where the act or omission occurred." *Id.*

Though the FTCA giveth to tort plaintiffs, it also taketh away. That is because the FTCA contains various exceptions to its general waiver of sovereign immunity— exceptions that reinstate the United States' immunity from suit in specified circumstances. We consider here the FTCA's discretionary function exception. That exception disallows tort liability against the United States in the case of claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). This exception is designed to "prevent 'judicial "second guessing" of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.'" *Morales v. United States*, 895 F.3d 708, 713 (9th Cir. 2018) (quoting *United States v. S.A. Empresa de Viacao Aerea Rio Grandense* (*Varig Airlines*), 467 U.S. 797, 814 (1984)).

The Supreme Court has established a two-part test to determine whether the discretionary function exception applies to a plaintiff's claim. *See Berkovitz v. United States*, 486 U.S. 531, 536–37 (1988). First, "we must consider whether the agency's allegedly negligent conduct is discretionary—that is, 'whether the action is a matter of choice for the acting employee.'" *Young*, 769 F.3d at 1053 (quoting *Berkovitz*, 486 U.S. at 536). This first step "is not

met where 'a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow.'" *Terbush v. United States*, 516 F.3d 1125, 1129 (9th Cir. 2008) (quoting *Berkovitz*, 486 U.S. at 536). But "[i]f there is such a statute or policy directing mandatory and specific action, the inquiry comes to an end because there can be no element of discretion when an employee 'has no rightful option but to adhere to the directive.'" *Id.* (quoting *Berkovitz*, 486 U.S. at 536).

If discretion is involved, however, we turn to the second step of the analysis. At that point, "we must determine whether the particular exercise of discretion was 'of the kind that the discretionary function exception was designed to shield.'" *Young*, 769 F.3d at 1053 (quoting *Berkovitz*, 486 U.S. at 536). "[O]nly governmental actions and decisions based on considerations of public policy" involve the relevant exercise of discretion. *Terbush*, 516 F.3d at 1129 (quoting *Berkovitz*, 486 U.S. at 536–37). In the context of the discretionary function exception, "[p]ublic policy has been understood to include decisions 'grounded in social, economic, or political policy.'" *Id.* (quoting *Varig Airlines*, 467 U.S. at 814).

But not everything the government does is grounded in these sorts of policy considerations. The discretionary function exception is not so broad that it would overtake the very waiver of sovereign immunity from which it cuts back. As we have explained, "'[t]he mere association . . . with regulatory concerns' . . . is insufficient to trigger the discretionary function exception; rather 'exempt decisions are those fraught with . . . public policy considerations." *O'Toole*, 295 F.3d at 1034 (quoting *Cope v. Scott*, 45 F.3d 445, 449 (D.C. Cir. 1995)); *see also, e.g.*, *Bolt v. United States*, 509 F.3d 1028, 1033 (9th Cir. 2007) ("At this second

step, it is therefore 'insufficient for the government to show merely that some choice was involved in the decision-making process. The balancing of policy considerations is a necessary prerequisite.'" (quoting *ARA Leisure Servs. v. United States*, 831 F.2d 193, 195 (9th Cir. 1987))). The government bears the burden of demonstrating that the discretionary function exception applies. *See Young*, 769 F.3d at 1052.

## B

In this case, there is no dispute that the government satisfied the first step of the discretionary function analysis, for there is no statute, regulation, or policy dictating how the grassy areas at Saipan's American Memorial Park must be maintained. Our inquiry thus focuses on the second step. This requires that we identify, based on Chang's allegations, "the precise action the government took or failed to take." *Young*, 769 F.3d at 1054. Here, the essence of Chang's allegations is that the United States "allow[ed] a dangerous hole" in a grassy recreational area "to go unrepaired." We thus examine whether this alleged negligence is grounded in considerations of public policy. To answer this question, we turn to the doctrinal scaffolding that we have erected to help resolve such inquiries, with particular focus on how the doctrine applies to personal injuries sustained in national parks and other places of natural wonder, cultural appreciation, and public recreation.

Our cases begin by recognizing that "[g]overnment actions can be classified along a spectrum," with some actions involving effectively zero policy considerations, and other actions inherently imbued with them. *Whisnant v. United States*, 400 F.3d 1177, 1181 (9th Cir. 2005). Thus, "[a]t one extreme of the policy prong of the analysis, where

the discretionary function exception provides no defense to liability, are those agency decisions totally divorced from the sphere of policy analysis." *O'Toole*, 295 F.3d at 1035. An example is a government employee's negligent driving, for "[a]lthough driving requires the constant exercise of discretion, the official's decisions in exercising that discretion can hardly be said to be grounded in regulatory policy." *Id.* (quoting *United States v. Gaubert*, 499 U.S. 315, 325 n.7 (1991)). On the far opposite side of the discretionary function spectrum are agency actions that are "fully grounded in regulatory policy." *Id.* Here we have offered as examples the regulation of banks and the enforcement of airline safety standards. *See id.*; *see also Young*, 769 F.3d at 1055; *Whisnant*, 400 F.3d at 1181.

To help evaluate where a given case falls along this spectrum, we have recognized a distinction between design and implementation. In particular, "we have generally held that the *design* of a course of governmental action is shielded by the discretionary function exception, whereas the *implementation* of that course of action is not." *Whisnant*, 400 F.3d at 1181. We have rationalized one of our earliest national park discretionary function cases, *ARA Leisure Services v. United States*, 831 F.2d 193 (9th Cir. 1987), on this axis. *ARA Leisure* involved a tour bus in Alaska's Denali National Park that ran off an eroded road and crashed. *Id.* at 194. Passengers of the bus and their survivors sued the United States for negligently designing the road without guardrails and for failing properly to maintain the road. *Id.* Minding a design/implementation distinction, "we held that designing the road without guardrails was a choice grounded in policy considerations and was therefore shielded under the discretionary function exception, but maintaining the road was a safety responsibility not susceptible to policy

analysis." *Whisnant*, 400 F.3d at 1181–82 (discussing *ARA Leisure*). Many of our cases have employed this design/implementation dichotomy. *See, e.g.*, *Kim v. United States*, 940 F.3d 484, 488 (9th Cir. 2019); *Marlys Bear Medicine v. United States ex rel. Sec'y of Dep't of Interior*, 241 F.3d 1208, 1215 (9th Cir. 2001).

One substantial category of "implementation" actions, to which the FTCA's discretionary function exception does not apply, is routine maintenance. As a general matter, to routinely maintain a place or thing is merely to carry out— most typically through rote upkeep—an antecedent policy decision that has already been made. As we have described it, "[o]ur case law directs that, by nature, matters of routine maintenance are not protected by the discretionary function exception because they generally do not involve policy-weighing decisions or actions." *Terbush*, 516 F.3d at 1133. That is particularly so when the standard upkeep in question has safety implications. *See Young*, 769 F.3d at 1059; *Terbush*, 516 F.3d at 1133; *Whisnant*, 400 F.3d at 1185.

Thus, in *Bolt*, we held that the government could be liable under the FTCA for its failure to clear snow and ice from an apartment complex parking area in which the plaintiff slipped, because "clearing snow and ice from parking lots constitute[s] a matter of routine maintenance beyond the scope of the discretionary function exception." 509 F.3d at 1034. In *Whisnant*, and in what we later described as "a clear case of maintenance failure," *Terbush*, 516 F.3d at 1133, we held that the government's negligence in not remediating a mold problem in a naval commissary fell outside the discretionary function exception. *Whisnant*, 400 F.3d at 1181–83. And in *O'Toole*, we decided that the government's negligent failure to repair an irrigation system, which resulted in flooding on the plaintiffs' property,

exceeded the discretionary function exception. 295 F.3d at 1035–37. The reason: "an agency's decision to forego, for fiscal reasons, the routine maintenance of its property—maintenance that would be expected of any other landowner—is not the kind of policy decision that the discretionary function exception protects." *Id.* at 1036.

Substantial maintenance work takes place at national parks and other similar federal properties. But although these settings can present unique considerations, the FTCA's basic doctrinal framework still holds. Our cases have therefore not hesitated to regard the government's negligent failure to conduct routine repairs in these places as beyond the bounds of the discretionary function exception. For example, in *ARA Leisure*, discussed above, we viewed the government's failure to repair an eroded road in Denali National Park as a matter of delinquent maintenance, to which the discretionary function exception did not apply. *See* 831 F.2d at 195. We explained that "Park Service maintenance work is not the kind of regulatory activity" for which the discretionary function exception bars liability. *Id.* And, as we noted in *Terbush*, "we do not quickly accept that every minute aspect of the NPS's work is touched by . . . policy concerns." 516 F.3d at 1130. Under our case law, therefore, a tort claim based on the government's failure to conduct routine maintenance at a national park is generally within the FTCA's waiver of sovereign immunity and outside its discretionary function exception.

Of course, just because something can be characterized as the "implementation" of a government plan or design, or government "maintenance" of a given area or item, does not necessarily mean the plaintiff can escape the discretionary function exception. As we explained in *Whisnant*, there is an "exception" to the "design/implementation distinction"

when "[t]he implementation itself implicates policy concerns." 400 F.3d at 1182 n.3. We offered as examples when government officials "consider competing fire-fighter safety and public safety considerations in deciding how to fight a forest fire," or when they are "balanc[ing] prison safety and inmate privacy considerations in deciding how to search a prisoner's cell in response to a reported threat of violence." *Id.* We have offered a similar caveat when it comes to maintenance. We have noted that unlike maintaining the eroding road in *ARA Leisure*, some kinds of maintenance activities can involve "complex decisions" that "would tend to implicate the broader mandates" of a regulatory policy regime. *Terbush*, 516 F.3d at 1134.

This complexity exists in the national park context when tort cases arise from features of a natural landscape that pose dangers to park visitors. We would not, for example, describe as a matter of "routine maintenance" the National Park Service's allegedly negligent determination not to fill in a bubbling mud pot at Yellowstone National Park, for such thermal features are part of the Park's unique natural and aesthetic environment, to which public policy considerations must necessarily be brought to bear when managing it. *See Young*, 769 F.3d at 1058 (explaining that NPS decisions that turn on "historic or natural resource preservation" are "susceptible to policy" determinations). The Park Service's alleged failure to remove slippery kelp from a tidepool would likewise not count as "routine maintenance," because any such action by the government would once again require an evaluation of various public policy considerations, including preserving marine life and maintaining the ocean ecosystem. As we explained in *Terbush*, "identifying and responding to hazards in the wild implicates the NPS's broader policy mandates to balance

access with conservation and safety." 516 F.3d at 1137. Removing snow and ice from a visitor center parking lot is a matter of routine maintenance, but removing snow and ice from Yosemite's Tuolomne Meadows cannot be so regarded.

Several of our cases involving federal park lands reflect this distinction. In *Childers v. United States*, 40 F.3d 973 (9th Cir. 1994), an 11-year-old boy fell to his death on an unmaintained trail in winter in Yellowstone National Park. We concluded that "[t]he decisions NPS made in this case reflected its determination of how best to manage the park in winter." *Id.* at 976. "Unable to maintain all the trails in the park" given Yellowstone's 2.2 million acres and 1,200 miles of hiking trails, we recognized that "NPS's decisions concerning warnings, trail maintenance, and trail closure . . . are policy-based, requiring [the NPS] to balance access with safety, and take into account conservation and resources in designing area plans and making individual trail determinations." *Id.* at 975, 976 & n.5.

By contrast, in *Young*, we held that the Park Service's failure to warn visitors about hazards in a snowfield was not subject to the discretionary function exception. 769 F.3d at 1057–58. In that case, a visitor to Mount Rainier National Park fell in a 12-foot-deep hole in a snowfield near the park visitor center, with the hole having formed because a buried transformer melted the snow, creating an unnoticeable cavity beneath a thin snow ceiling. *Id.* at 1051–52. We recognized that "when the NPS decides whether to warn of dangers that exist naturally in its national parks, those decisions generally are guided by considerations of policy." *Id.* at 1056. But we distinguished cases like *Childers* because the snowfield at issue in Mount Rainier was located near the visitor center, and the hazard created by the transformer was "not located

'in the wild'" and "ha[d] no connection to visitor enjoyment or 'protection of wildlife and the general alpine environment.'" *Id.* at 1058 (first quoting *Terbush*, 516 F.3d at 1137, and then quoting *Blackburn v. United States*, 100 F.3d 1426, 1434 (9th Cir. 1996)).

Lastly, in *Lam v. United States*, 979 F.3d 665 (9th Cir. 2020), we held that the discretionary function exception applied when a 60-foot live oak in a Lake Mendocino campground fell on a camper's tent, injuring him. Over Judge Hurwitz's dissent, which regarded the matter as "a straightforward personal injury case" involving the government's failure to follow its plan of tree inspection, *id.* at 688–89 (Hurwitz, J., dissenting), we held that the decision whether to cut down the tree involved policy considerations. *Id.* at 681–82. That was because in deciding whether the tree should be removed, park employees had to weigh aesthetics, the tree's role in providing sustenance and shelter to birds, and elements of public safety. *Id.* at 681–82.

We conclude our examination of the case law with the following observations. Although each FTCA discretionary function exception case turns on its own facts, the distinctions between the design of a government plan and its implementation, the extent to which the action is one of routine maintenance, and the degree to which the maintenance involves disruption to the natural environment, all inform the assessment of when the discretionary function exception applies. These considerations help us to place a given government act or omission on the spectrum of decisions that may be susceptible to public policy considerations and to which the discretionary function exception would apply.

C

Based on our review of the case law, we conclude that the NPS's allegedly negligent failure to repair a hole in a regularly maintained grass area does not fall within the discretionary function exception.  This is a matter of routine maintenance to which the discretionary function exception does not apply.

This case involves the government's alleged failure to fix a basic hazard on a common type of well-traversed terrain for which any property owner would be regularly held responsible.   The challenged conduct is not the government's decision whether to create or maintain the recreational area where Chang was injured, or how that area was designed.   *See O'Toole*, 295 F.3d at 1036–37 (explaining that "routine ditch maintenance" did not fall within the discretionary function exception because although "the [government] was under no obligation to acquire [the property], . . . once it did, it also acquired the obligation to keep its irrigation system from causing harm to others to the same extent that a private landowner must").  We thus deal with the implementation of an established governmental policy decision already made, *see ARA Leisure Servs.*, 831 F.2d at 195, and, within that, a very standard form of property maintenance: ensuring that highly trafficked grass areas are free of sizeable hidden cavities that may result in injuries.  If filling a hole in grass does not count as routine maintenance that is outside the discretionary function exception, very little would.

In fact, the record amply demonstrates that the NPS itself regards this issue as one of routine maintenance.  American Memorial Park staff member Togawa specifically explained that he "routinely maintain[ed] this area."  Togawa cut the

grass with lawn mowers and was "trained to look for imperfections while maintaining Park grounds." When Park workers discover such imperfections, "they are marked and filled in with dirt, rocks or a combination of both." To be sure, Togawa maintains that he "did not discover any holes in the Amphitheater area during [his] routine lawn maintenance before or after Plaintiff's fall." Park Superintendent Alberti likewise says she observed no holes in the area in question. But although this may support a defense to Chang's allegations on the merits, it does not take away from the essential nature of the alleged negligence here: failing to fill a large hole in a popular lawn area, a basic safety maintenance issue to which considerations of public policy play no meaningful role.

The decision whether to fill these holes lacks any material foothold in aesthetic, ecological, or cultural considerations. Nor is this a situation in which park employees are being asked to address a hazard "in the wild," which would undermine the natural environment. *Terbush*, 516 F.3d at 1137. The Park landscape may have natural grades and undulations, but unlike the unmaintained winter Yellowstone trails in *Childers*, NPS here regularly maintained the grass area as a field for play and enjoyment, much like most any neighborhood park or backyard. NPS regularly fixed holes in the grass, but by the allegations of the complaint, not this one. Park Superintendent Alberti avers that the Park's grounds are not "managed to a pristine standard." But Chang does not claim the Park should have furnished flawless putting greens. He claims only that the Park should have done what Park employee Togawa said Park staff already did: fill holes in the grass.

This case is thus far closer to the removal of snow and ice around a parking lot, *see Bolt*, 509 F.3d at 1034, the

repair of an eroding road, *see ARA Leisure Servs.*, 831 F.2d at 195, or the obligation to prevent snow hazards near a transformer by a visitor center, *see Young*, 769 F.3d at 1058–59. And it is substantially different even from the decision whether to remove a large live oak tree near a campground, which involved considerations of "wildlife and habitat preservation" and "aesthetics," *Lam*, 979 F.3d at 681, in a way that repairing holes in a grass lawn simply does not.

To the extent the government contends it did not fill holes in the grass solely due to resource constraints—an excuse that the declarations from Park employees do not offer—any such budgetary argument would be unavailing. We have "held that the government [cannot] invoke the discretionary function exception by citing budgetary constraints as the sole reason for its failure to perform routine maintenance or to take routine safety precautions." *Nanouk v. United States*, 974 F.3d 941, 948–49 (9th Cir. 2020). Because "[b]udgetary constraints underlie virtually all governmental activity," *ARA Leisure Servs.*, 831 F.2d at 196, treating this as a public policy consideration sufficient to trigger the discretionary function exception would unduly limit the circumstances in which the government can be held liable under the FTCA. *See O'Toole*, 295 F.3d at 1037; *see also Bolt*, 509 F.3d at 1034 ("In enacting § 2680, however, Congress did not intend to protect decision-making based on budgetary constraints.").

Finally, at oral argument, the United States emphasized that in its view, there is no evidence of a one-foot-deep hole that would have been detectable to Togawa or other Park workers. But we must accept the allegations as pled and the record as it stands. Based on that, we hold that the FTCA's discretionary function exception does not apply because the NPS's maintenance of a recreational grass lawn was not

susceptible to public policy analysis.  We reverse the district court's dismissal of Chang's complaint and remand for further proceedings consistent with this opinion.[1]

**REVERSED AND REMANDED.**

---

S.R. THOMAS, Circuit Judge, dissenting:

I respectfully disagree with the majority that the discretionary function exception does not apply.  As the district court correctly concluded, "the standard to which the [Park employees] choose to keep the grassy areas . . . necessarily required decisions based on public policy concerns."

## I

It is undisputed that the government satisfied the first step of the discretionary function analysis because the applicable policies give the government discretion in how to maintain the relevant grassy field.  Congress gave the National Park Service ("NPS") the duty to "promote and regulate the use of the National Park System" in order to "conserve the scenery, natural and historic objects, and wild life" such that it would be "unimpaired for the enjoyment of future generations."  54 U.S.C. § 100101.  The relevant NPS

---

[1] Chang's complaint also briefly alleged without facts that the government failed to warn of the hole in the grass.  Because the basis for Chang's failure to warn claim is unelaborated, it is unclear whether it would implicate the discretionary function exception.  Although such a warning claim would appear to be duplicative from a liability standpoint, to the extent Chang wishes to pursue it, he should seek leave from the district court to file an amended complaint, at which point the district court can evaluate the claim in light of our analysis in this opinion.

Management Policies specifically state that they "do not impose park-specific visitor safety prescriptions" and that "[t]he means by which public safety concerns are to be addressed is left to the discretion of superintendents and other decision-makers at the park level who must work within the limits of funding and staffing." The relevant NPS Director's Order also gives the park superintendents the power to make "discretionary decisions that balance public recreation and safety with preservation of the protected natural, historic, and cultural setting." As these provisions make clear, NPS is designated with the discretion to make policy decisions that balance providing access to natural settings, safety, finite resources, aesthetics, opportunities to reflect on history, and encouragement of outdoor community events.

In order to fulfill these duties, the Park employees conduct "informal visual inspection[s]" of the Park grounds. When "imperfections are discovered, they are marked and filled in with dirt, rocks or a combination of both." However, "[t]he Park grounds and lawns are not managed to a pristine standard – they are subject to imperfections and undulations that would be typical of general-use grounds that are subject to various forms of recreation, maintenance vehicle use, erosion and weather impacts, and natural impacts from wildlife or subsurface animal activity."

Although the Park employees are required to discover and fill imperfections, no mandatory criteria exist for identifying imperfections. *See Valdez v. United States*, 56 F.3d 1177, 1180 (9th Cir. 1995) (finding that while the "policy guidelines certainly outline general policy goals regarding visitor safety, the means by which NPS employees meet these goals necessarily involves an exercise of discretion"). Therefore, the relevant policies by their general

nature allow Park employees to exercise judgment and discretion. Because the relevant policies have no specific mandatory requirements for identifying and filling "imperfections," the Park employees had discretion to act according to their own judgment in assessing the Park grounds. This discretion satisfies the first part of the discretionary function exception test.

## II

Where the express or implied government policy "allows a Government agent to exercise discretion, [as is the case here,] it *must be presumed* that the agent's acts are grounded in policy when exercising that discretion." *United States v. Gaubert*, 499 U.S. 315, 324 (1991) (emphasis added). "The focus of [this Court's] inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." *Id.* at 325. The government must only prove that the challenged action was susceptible to policy balancing and need not prove that a government employee actually balanced economic, social, and political concerns in reaching his or her decision. *See Prescott v. United States*, 973 F.2d 696, 703 n.5 (9th Cir. 1992).

The decisions regarding conducting "informal visual inspection[s]," only having one to three laborers on duty daily, leaving the grounds in a non-pristine condition, and filling only "imperfections," are all decisions that result from balancing competing policy considerations, such as safety, budget, staffing, wildlife and habitat preservation, impact on the natural vegetation, and aesthetics. These decisions are thus the type of policy decisions that are protected under the discretionary function exception. *See, e.g., Valdez*, 56 F.3d

at 1180 ("Here, the challenged conduct clearly implicates a choice between the competing policy considerations of maximizing access to and preservation of natural resources versus the need to minimize potential safety hazards."); *Lam v. United States*, 979 F.3d 665, 682 (9th Cir. 2020) ("Competing interests and policy concerns require balancing and weighing; balancing and weighing involve discretion; and policy discretion invokes the [discretionary function exception].").  Here, competing interests were involved in determining to what level the grass would be maintained. Based on these competing policy considerations, NPS staff determined that the grounds would be maintained in a non-pristine condition and only "imperfections" would be filled.

## III

The majority attempts to draw a distinction between the decision *to maintain* the grassy field and the decision about *how* NPS maintained the grassy field.  Although we have held that negligent implementation can in some cases fall outside the scope of the discretionary function exception, in those cases, we have held that the conduct in question *was not grounded in policy considerations* and thus failed the second part of the discretionary function exception.  *See e.g.,*

*Camozzi v. Roland/Miller & Hope Consulting Grp.*, 866 F.2d 287, 290 (9th Cir. 1989) ("The alleged negligence upon which plaintiffs rely—the negligence of USPS in performing its retained safety functions—involved no policy choices."). We, however, have made clear that the discretionary function exception does not permit liability where, as here, "the implementation itself implicates policy concerns." *Whisnant v. United States*, 400 F.3d 1177, 1182 n.3 (9th Cir. 2005).

Chang does not allege in his complaint that NPS knew or was aware of the hole's existence. Indeed, in his administrative complaint, he stated, "[t]he hole was not visible to a normal person using reasonable care . . . ."[1] Nor does Chang allege that the hole was negligently repaired. Even if Chang had claimed that the hole had been identified but not properly filled, the government must prove only that the challenged action—filling the hole—was susceptible to policy balancing, and need not prove that a government employee actually balanced economic, social, and political concerns in reaching his or her decision. *See Prescott*, 973 F.2d at 703 n.5. Even if an NPS employee had seen the hole, the employee would have needed to balance policy considerations to decide whether it was an "imperfection" to be filled, or a part of the landscape to preserve. That is enough to satisfy the government's burden. Ultimately, Chang's proposed theory, which the majority accepts, allows "the design-implementation distinction to override the discretionary function exception analysis in contravention of the Court's clear command: we look first to whether a policy permits [] discretion, and if it does, then we must presume that [the] act or omissions are grounded in policy, whether or not we suspect that the discretion involved has been abused." *Gonzalez v. United States*, 814 F.3d 1022, 1036 (9th Cir. 2016).

The cases cited by the majority are inapposite to the facts before us. First, both *ARA Leisure Servs. v. United States*, 831 F.2d 193 (9th Cir. 1987) and *Bolt v. United States*, 509

---

[1] Consistent with Chang's statement that the hole was not visible, the uncontradicted affidavit of the groundskeeper stated that he "did not discover any holes in the Amphitheater area during my routine lawn maintenance before or after [Chang's] fall."

F.3d 1028, 1033 (9th Cir. 2007) involved the government's failure to comply with its own policies.  Here, Chang did not identify any policy with which NPS failed to comply.

Second, in *Whisnant* the Court held that "the government's alleged failure to maintain safe and healthy premises was not a decision susceptible to considerations of social, economic or political policy." 400 F.3d at 1179. There were no policy considerations that could justify the government's failure to eradicate a mold problem in a naval base commissary.  *Id.*  Here, policy considerations were involved in determining what constituted an "imperfection" and when to fill it.  The decision involved the balancing of various considerations including public safety, ecology, wildlife preservation, staffing and budgetary constraints, and park aesthetics.

Third, in *O'Toole v. United States*, 295 F.3d 1029, 1036–37 (9th Cir. 2002), the government decided to "forego, for fiscal reasons, the routine maintenance of its property" and did not assert any reasons other than financial constraints for making this decision.   Here, NPS did conduct daily maintenance of the Park grounds.  But based on various policy considerations, including preserving the natural setting of the Park, NPS determined that the "Park[] ground and lawns [would] not be managed to a pristine standard." Here, unlike in *O'Toole*, the government did not completely forego routine maintenance based solely on financial considerations; rather, NPS established policies that called for routine maintenance but allowed for discretion in determining when holes in the ground should be filled and when they should be left unaltered.  This decision involved the weighing of financial constraints, but also other considerations, including aesthetics and safety.

The facts here are much more analogous to those in *Lam v. United States*. 979 F.3d 665. There, the government employed a worker who was trained "to identify and remove hazardous trees" based on certain factors that would signal a threat. *Id.* at 670–71. The Operational Management Plan ("OMP") that governed identifying and removing hazardous trees contained general requirements for rangers inspecting, maintaining, and removing trees, but did not specify how the rangers were to carry out those general requirements. *Id.* at 679. The *Lam* Court held that, "[a]lthough the OMP does require daily inspections, there is no requirement, checklist, or criteria for how to conduct these inspections or what they should cover. That is left out of the policy language and left up to the ranger's discretion." *Id.*

Similarly, here, the relevant policies that allow laborers discretion in determining when to fill holes compel the same conclusion. As *Lam* recognized, when the government is balancing policy considerations and the relevant policies in place do not direct a particular course of action, the government is protected by the discretionary function exception. *See id* at 681–82. Here, there was no specific policy in place that dictated that all holes needed to be filled. Rather, after weighing competing policy interests, NPS determined that the grounds should be maintained in a non-pristine manner and would be subject to imperfections. The laborers, like the rangers in *Lam*, were tasked with using their discretion to determine when divots in the ground constituted "imperfections" that warranted repair.

## IV

The majority claims that if the discretionary exception covers this conduct then "very little would" be outside the scope of the exception. But a hole in a grassy field in a

national park is very different from a hole in a parking lot or a road.  Contrary to the claim that the grassy field was more like a "neighborhood park or backyard," the grassy field is a part of the national park's ecosystem.  Therefore, although the field may not be part of the "wilderness," the environment is unique and NPS must balance the need for public access and safety with the need to preserve the wildlife, vegetation, and natural ecosystem, consistent with the Congressional directive that the NPS "promote and regulate the use of the National Park System" in order to "conserve the scenery, natural and historic objects, and wild life" such that it would be "unimpaired for the enjoyment of future generations."  54 U.S.C. § 100101.  The decision of how to weigh these competing interests was left to the discretion of NPS, so the discretionary function exception applies.

V

Chang is not able to identify any mandatory policies NPS failed to follow and he has not sufficiently defeated the presumption that the discretionary act—how to maintain the grassy field—does not involve competing policy considerations.  Nor does he claim the hole was visible to any reasonable observer or that the NPS negligently repaired the hole.  The fact that the discretion codified in the relevant policies applied at the implementation stage does not change that the relevant government agent's acts were grounded in policy when exercising that discretion.  Therefore, the discretionary function exception applies.

For these reasons, I respectfully dissent.